# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 14, 2010

## STATE OF TENNESSEE v. JAMES ALTON WALTON

**Direct Appeal from the Circuit Court for Dyer County**
**No. 08-CR-352     Lee Moore, Judge**

------

**No. W2009-02100-CCA-R3-CD  - Filed May 23, 2011**

------

A jury convicted the defendant, James Alton Walton, of aggravated burglary, a Class C felony, and theft of property $500 or less, a Class A misdemeanor.  The trial court sentenced him to an effective ten-year sentence.  On appeal, the defendant argues that the evidence was insufficient to sustain his convictions and that the trial court erred in sentencing the defendant.  After reviewing the record, the parties' briefs, and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

James E. Lanier, District Public Defender; Patrick McGill (on appeal and at trial) and Christy Cooper (at trial), Assistant Public Defenders, for the appellant, James Alton Walton.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Renee Creasy and Karen Burns, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

A Dyer County grand jury indicted the defendant, James Alton Walton, for one count of aggravated burglary, a Class C felony, and theft of property more than $1,000, a Class D

felony. The trial court held a jury trial on July 23-24, 2009, and the parties presented the following evidence.

*State's Proof*

Michael Shawn Gilbreth testified that he lived in Dyersburg, which was in Dyer County, Tennessee. Gilbreth identified the defendant and said that he knew him because he was the son of his next door neighbor, James Walton, Sr. He said that the defendant was not his neighbor at the time of the trial, but he had lived in the rental property on the other side of his trailer home from the Fall of 2007 through the Spring of 2009. Gilbreth stated that he met the defendant "shortly after [he] bought the home when [the defendant] came to [his] front door and asked [him] if [he] wanted to buy a woman's ring[,] and [he] told [the defendant that he] did not want to buy a woman's ring from him . . . ."

Gilbreth recalled that on June 29, 2008, he and his then girlfriend, Melissa Bedwell, left his home to go to church around 10:15 a.m. He stated that he locked his bedroom, back, and front doors with a shackle and hasp latch, which was his "routine." Gilbreth said that he began this routine because he had "been the victim of repeated, unresolved burglaries." He initially locked only his exterior doors, but he began to lock his interior bedroom door after someone burglarized his home during April 2008.

Gilbreth said that on June 29, he

> walked out the back door, locked the door, walked back around, locked the door from the inside with the deadbolt as well, locked the bedroom door, secured . . . what [he called his] valuables in that bedroom and exited out the front door and locked that door along with [Bedwell] and [they] departed for church that morning.

They went directly home after church and arrived there a little before noon.

Gilbreth stated that when he entered his home he noticed that his home was "way too quiet." The temperature outside was in the mid 90's, but his air conditioner was not running. He said that he did not hear the compressors for his deep freezer or refrigerator because they were not running either. He assumed that his power was off, which was common, and not having power did not immediately disturb him.

Gilbreth began walking toward his bedroom, which was in the back of the home, and heard a noise outside his back door. He was unable to exit the back door because he had locked it from the outside that morning, so he exited from the front door and walked around his trailer to the backyard. When Gilbreth exited the front door and walked to the backyard,

Bedwell was still in the front driveway. He believed she was sitting in his truck smoking a cigarette. When he got to the backyard, he saw the defendant walking along the "fence line." He said that the defendant used a board that was at the fence as a ladder and climbed the fence. When the defendant got to the top, Gilbreth yelled his name, and the defendant "turned around and looked at [him] as he fell over the fence." He said that the defendant was wearing a "dark colored jersey glove as he was climbing the fence . . . ."

Gilbreth walked over to the defendant's property and saw the defendant standing on the back porch. Gilbreth asked the defendant why he was in his backyard and jumped the fence, and the defendant told him that he was looking for his puppy. According to Gilbreth, the defendant told him that he "better get out of his yard before he called the law on [him], but [Gilbreth] was telling [the defendant] that he did not need . . . to be jumping [his] fence, let alone, to be in [his] [backyard] at all." By that time, Bedwell had joined the men in the backyard, and she asked the defendant what was on his porch. Gilbreth looked down and saw the defendant "fiddling with a rug with his foot."

Gilbreth testified that he followed Bedwell as she walked toward the defendant. She pulled back the rug, and they saw "her laptop inside its case, [Gilbreth's] laptop[,] and cedar lock box that [Gilbreth's] uncle had made for [him] . . . ." Gilbreth said that he could recognize his laptop because it had a Tennessee Titans helmet sticker on the front. He said that the defendant denied that he had taken the items, and the defendant told Gilbreth that he "wasn't [going to] pin this on him; that there was this tall guy that [Gilbreth] needed to go after right now and that he was just getting the things for . . . safekeeping."

Gilbreth testified that he did not believe the defendant. Bedwell called the authorities while Gilbreth stayed with the defendant. Gilbreth followed the defendant when he took the items to his front door. According to Gilbreth, the defendant was "being hostile and threatening toward [him,] but [Gilbreth] told him [that he] was not [going to] let those items out of [his] sight . . . ." He stated that the defendant opened his front door, and the puppy, for which the defendant claimed he had been looking, came outside and went back inside the defendant's home. He further stated that the defendant got a black trash bag from inside his home, placed the computers and the lock box in the bag, and began walking toward his parents' home. Gilbreth followed the defendant into the defendant's parents' backyard. He said the defendant knocked on his parents' back door and "became extremely threatening at that point." Gilbreth testified that the defendant told him that "if [he] didn't get out of there . . . his daddy's 380 would make [him]."

The defendant's parents did not open the door, and by this time, Bedwell had reached the gate to the defendant's parents' yard. Bedwell did not enter the backyard, but she was within speaking distance and tried to convince the defendant to return her and Gilbreth's

items. Gilbreth said that the defendant eventually gave him the bag and left. Gilbreth brought the bag to his yard and left it there. He said that he did not open the bag until the authorities arrived. He and the defendant did not have any further contact that day.

Gilbreth went to the back of his home and

saw the hinges to [his] door laying on the deck, saw the screwdriver with the small diameter that would fit inside the hinge, noticed the hammer in the second bedroom that [he] knew wasn't [his], saw the lock off the bedroom door that was broken off inside there, saw the electric box outside that was open and switched turned off.

Gilbreth identified the hammer that he found in his bedroom and said that he had never seen the hammer before June 29, 2008. Gilbreth stated that his parents were the only other people who had keys to his lock. He said that he had never given the defendant permission to enter his home or to take anything from his home.

When the authorities arrived, Gilbreth went through the trash bag that the defendant had given him. Gilbreth said that he recovered his laptop and cedar lock box from the bag. Before he retrieved his laptop from the bag, Gilbreth had last seen it when he placed it under his bed a few hours before. He said that when he purchased the laptop it cost $700. Gilbreth described his cedar lock box as a "roughly ten to eleven inch[] square, [that had] a hinged lid and also [had] a shackle and hasp and small lock . . . ." He said that the box did not contain any valuables. He had last seen the box before church when he placed it on a shelf under his television in his bedroom. He stated that the box was homemade and had sentimental value. He estimated that the materials used to make the box cost $20. Besides the laptop and cedar lock box, Gilbreth noticed that his Swiss Army watch with a leather band was missing, which cost $50 new. He last saw the watch on his night stand before he went to church.

On cross-examination, Gilbreth testified that characterizing his relations with the defendant as enemies would not be fair. He denied pulling a gun on the defendant's parents and going to court for doing so. He later testified that he did go to court for allegedly pulling a gun on the defendant's parents, but he said that the court dismissed the case. He said that he and the defendant's parents had disputes regarding the boundary lines to their properties. He stated that the defendant's parents did not want him to mow the grass on the "two feet marked along their fence line. They wanted to come into [his] backyard and mow it."

Gilbreth did not recall arguing with the defendant. However, he remembered an incident when the defendant asked him if he had told a neighbor that he and the defendant "were into it." Gilbreth stated that before this burglary, he had called the police to his home

about three or four times regarding burglaries. A couple of days after the June 29 incident with the defendant, Gilbreth asked the defendant's mother why she was upset with him. Gilbreth did not understand why the defendant's parents were angry with him because "[he was] the victim here."

On redirect examination, Gilbreth testified that the case regarding him pulling a gun on the defendant's parents occurred after the incident with the defendant. He said that he believed that the animosity had grown on their part, but he tried "not to be that kind of person." He also said that he just wanted to live in his home without anyone stealing from him or throwing trash in his yard. Gilbreth stated that he was anxious and nervous during the incident with the defendant. He explained that he had repeatedly been burglarized, but he had never witnessed someone burglarizing his home.

On recross-examination, Gilbreth testified that he had a gun the day that the defendant's parents accused him of pulling a gun on them. He said that he had it to his side, but did not pull it out on the defendant's parents or anyone else. Gilbreth stated that he "was scared half to death" because the defendant walked in front of his home repeatedly and was being verbally abusive. Gilbreth said that he feared for his life.

Melissa Bedwell testified that she used to date Gilbreth. She accompanied him to church the morning of June 29, 2008. She had spent the previous night at Gilbreth's home, and they left for church around 10:00 a.m. that morning. Bedwell said that when they left for church, she left some of her items in a duffel bag on the bed in Gilbreth's spare bedroom. Gilbreth put her laptop under the bed in his room with his laptop so that he could lock them in the room. Bedwell said that she saw the locked bedroom door.

Bedwell said that she and Gilbreth went straight to his home after church. When they arrived, Gilbreth exited his truck and began to unlock the door to his home while she smoked outside. She said that shortly after Gilbreth unlocked the door, he ran to the back of his home. She asked him what was wrong, but he did not answer her. When he came back to the front of the home, he told her that the defendant had jumped the fence. Bedwell went to the back of Gilbreth's home while Gilbreth went to the defendant's home. While in Gilbreth's backyard, Bedwell observed the defendant bending over and picking up her laptop, which was in a black bag, and Gilbreth's laptop. She said that after the defendant picked up the laptop he walked toward his porch. While the defendant was walking toward his porch, Bedwell was "hollering for [Gilbreth] to let him know that [the defendant] had [their] laptops." Bedwell removed her high heel shoes and ran around Gilbreth's house toward Gilbreth, who was in the defendant's backyard. When she reached the defendant's backyard, Bedwell removed her jacket, gave it to Gilbreth, and told him that the defendant had their laptops. She saw that the laptops were on the porch and approached the defendant

to retrieve them after she saw him pull a rug over them. She stopped approaching the defendant, however, when he became "a little hostile" toward her. Bedwell then retrieved her cell phone from Gilbreth's truck and used it to call the police.

While she was still on the phone with the police dispatcher, Bedwell went to the front of the defendant's trailer home where the defendant and Gilbreth were standing. She noticed that the defendant had a black bag and told Gilbreth that their belongings were in the bag. The defendant began walking toward his parents' home, and she and Gilbreth followed him to keep an eye on their belongings. The defendant and Gilbreth went into the defendant's parents' fenced-in backyard, but Bedwell stayed on the other side of the fence. She was no longer on the phone with the police dispatcher, and she and Gilbreth tried to convince the defendant to return their belongings. She said that the defendant said that "it was too late, [she] had already called, [and] that he was going to get charged with it anyways." The defendant eventually gave them the bag, and they took it to Gilbreth's home and left it on the ground until the police arrived.

Bedwell stated that the defendant took a HP laptop from her that day. She had last seen the laptop in the living room by the couch, but she said that Gilbreth later placed it under his bed. She estimated that the value of the laptop was $900. The last time she saw the laptop was when they retrieved the bag from the defendant. Bedwell also stated that the defendant took a diamond ring from her. She saw the ring before church in her duffel bag that was in the defendant's spare bedroom. She said the value of the ring, which was never recovered, was about $200. She also claimed the defendant took her gold and diamond tennis bracelet, which was also in the duffel bag. She last saw the bracelet Saturday evening. She never recovered the bracelet, which she valued at $60. She denied giving the defendant permission to take her laptop, ring, or bracelet.

Bedwell had gotten herself ready for church in Gilbreth's spare bedroom and said that she did not notice any tools laying out in the bedroom that morning. When she later went in the bedroom, she saw a hammer on the dresser. She identified the hammer for the court and said that it did not belong to her and that she had never seen it before that day. Bedwell identified the defendant and said that she had seen him before the June 29 incident. She stated, however, that she did not have a relationship with the defendant or his parents before the incident.

On cross-examination, Bedwell testified that before June 29, she had stayed at Gilbreth's home a total of two to three weeks. She said that she had met the defendant's parents and seen them on their property before June 29 but did not have any "dealings" with them. Besides the jewelry, Bedwell also had clothes, shoes, and a pair of costume jewelry earrings in her duffel bag.

Bedwell said that when she was in Gilbreth's backyard, she was about "two to four hundred yards" from the fence between Gilbreth's and the defendant's property. She saw the defendant pick up their laptops through the cracks in the approximately six feet tall wooden fence. She said her laptop bag was distinguishable because "[t]he little thing that's on the front of the laptop bag [was] . . . missing and it doesn't have it on there and the bag that he picked up also did not have it on there." She stated that when she tried to retrieve the bags, the defendant was hollering and saying that he did not have anything.

Bedwell said that when she called the police, she told them that "someone had broke[n] in, had [their] things, [and] they needed to send a police officer." The dispatcher advised her that the police were on their way and told her to call back if she had further trouble. Bedwell stated that she was on the phone with the police "a good while" before they disconnected their call. Bedwell was on the defendant's property the entire time she was speaking with the police dispatcher, and she saw the defendant with a black garbage bag in his hand. She could not hear what the defendant and Gilbreth were saying while she was talking to the dispatcher.

When Bedwell finished her conversation with the dispatcher, Gilbreth told her that the defendant, who was walking down the street, had their property in the black garbage bag. She followed the defendant and Gilbreth to the defendant's parents' yard. She said that the defendant was standing on his parents' back steps and knocking on their door. Gilbreth was standing inside the defendant's parents' metal gate, and Bedwell was standing on the outside. She said that when the defendant said that he was not going to give them the bag because they would charge him anyway, she told him that they would consider dropping the charges and not having the police arrest him. The defendant surrendered the bag to them, and they placed it beside Gilbreth's steps. Bedwell stated that she never saw anyone put anything in the bag and did not see what was in the bag until they had retrieved it from the defendant.

On redirect examination, Bedwell testified that she did not see anyone else in the defendant's yard while she was looking through the fence or while she was in the defendant's backyard confronting him. She further testified that she did not see any other person come out of the defendant's home or yard while she was at the truck getting her cell phone or while she was following the defendant and Gilbreth down the street.

Deputy Rick Gregory, with the Dyer County Sheriff's Department, testified that he responded to Bedwell's call. He recalled that Gilbreth and Bedwell were in the yard close to the driveway and their vehicle. He asked them what the problem was, and they told him what had happened. The officers went inside Gilbreth's home to make sure no one was

inside. After he checked Gilbreth's home, Deputy Gregory went back outside and took Bedwell and Gilbreth's statements.

Deputy Gregory identified the defendant and said that after he got the victims' statements, he went to the defendant's home. He stated that he knocked on the door for about five minutes before the defendant came to the door. He said that the defendant was on his cell phone when he answered the door. The defendant came outside, sat, and continued to talk on his cell phone. After the defendant got off his cell phone, he immediately told Deputy Gregory that "he had just seen a white, skinny dude run out of the back of [Gilbreth's] house." He said the defendant told him that the man "threw something in the back of [his] yard and then he ran into the woods behind Mr. Gilbreth's house." During his investigation, Deputy Gregory looked at Gilbreth's yard. He described it as "fairly clean . . . and clear." He stated that the backyard did not open to anything, such as another backyard. He further stated that Gilbreth had a "hill" in his yard that one could not climb without the assistance of a rope or other type of climbing equipment.

Deputy Gregory testified that when the defendant finished telling him what had happened, he looked at the defendant's clothing and noticed he was wearing the same thing that Gilbreth and Bedwell had told him that the suspect whom they had seen climbing the fence was wearing. Based on the defendant's, Gilbreth's, and Bedwell's statements, Deputy Gregory took the defendant into custody. Deputy Gregory and the other officers on the scene searched the area for additional evidence after officers transported the defendant away from the property.

While searching the defendant's property, Deputy Gregory saw an area rug hanging over the defendant's back deck. At the time, the rug did not have any significance to Deputy Gregory. He also found a single "brown jersey glove" on the back deck. At Gilbreth's home, Deputy Gregory noticed that the back door "was not your standard mobile home type door. It looked like it had been replaced by a residential type door. . . . Most mobile home doors are pin and hinge type doors. [Gilbreth's] had three hinges." He stated that the hinges were outside Gilbreth's home, and he found a small screwdriver and two hinge pins on the deck. He further stated that the screwdriver was four inches and could "knock a pin out."

Deputy Gregory stated that Gilbreth told him about the lack of power in his home. When he investigated, Deputy Gregory saw that the utility panel was open and the main breaker was off. He said that it was hot inside Gilbreth's home. Deputy Gregory saw the lock, which was missing some parts of the hasp, on Gilbreth's bedroom door. He said that the lock "looked like somebody struck it with something and pretty much destroyed it." He identified the hammer, which he recovered from a desk in Gilbreth's spare bedroom, and the state entered it into evidence. Deputy Gregory said that when "CID" arrived at the scene,

they went through the black bag. He recalled that the bag contained two laptops, one of which was in a laptop bag, and a small wooden box. Deputy Gregory searched the area around where the defendant had jumped over the fence and the defendant's home in an attempt to find other items that they did not recover from the bag. Deputy Gregory did not recover the remaining items.

On cross-examination, Deputy Gregory testified that at approximately 12:08 p.m. he received the call to investigate the incident. He further testified that he did not work in the Dyer County Jail and could not say whether their intake sheet, which listed the defendant's time of arrest as 12:08 p.m., was incorrect. He stated that 12:08 may have been the time that Deputy Goff, who was at the scene of the incident, transported the defendant. Deputy Gregory said that he did not see Deputy Goff speak to Gilbreth. He also said that he did not hear Gilbreth mention that the defendant had scratched his arms while climbing the fence, nor did he see any scratches on the defendant. Deputy Gregory recalled that Lori Walton, the defendant's wife, cooperated with him and allowed him to search the defendant's home. Deputy Gregory did not take fingerprint or DNA evidence. He stated that the only evidence he collected was the hammer, and he released the computers and the lock box back to their owners.

On redirect examination, Deputy Gregory testified that he was not certified to take fingerprints and officers do not take them in every case. He said that he helped in making assessments whether officers needed to take fingerprint or DNA evidence, and he did not think that this case warranted fingerprinting or DNA testing.

*Defendant's Proof*

Bicki McCollum, the records clerk at the Dyer County Sheriff's department, identified the Dyer County Sheriff's Department Intake Sheet for the defendant, and the defense entered it into evidence. McCollum testified that the intake sheet listed the defendant's time of arrest as 12:08 p.m. She also identified the complaint card for the call to the police department and the incident report for this case.

On cross-examination, McCollum testified that as records clerk she entered information about the call into the computer, read and coded each report, and retrieved reports for people who wanted one. She stated that she did not create the reports, and she "merely" managed them. She further stated that she did not dictate the intake and arrest times for the report and relied on the officers for the information. She had no personal knowledge of the arrest times and did not know whether the times were exact because she was never on the scene of the incidents.

The defendant's father, James Walton Sr., recalled when authorities arrested the defendant. He stated that he had just had both of his knees replaced and was bedridden. He said that his wife was at church so the defendant was at his home the morning of June 29 helping him. He said that the defendant left shortly after 12:00 p.m. He did not see the defendant again that day and did not hear anyone knock on his door.

On cross-examination, James[1] testified that he was taking Hydrocodone every six hours for the pain associated with his surgery. He had been taking Hydrocodone for a while and said that the pills did not make him sleepy, and he was "very alert." He said that the defendant's helping him was convenient because the defendant lived down the street. He said that he loved the defendant, but he was not going to lie for him. James said that he had never been convicted of a felony or convicted for a "worthless check," but he did serve time in jail when he was sixteen years old.

Lori Walton, the defendant's wife, testified that she and the defendant had been together for eight and a half years and married for almost one year. She lived with the defendant on Walton Road on June 29, 2008. She said that a disturbance woke her that morning. She thought that the defendant just had the television too loud and got up to "fuss at him." Lori said that the defendant and Gilbreth were in the kitchen "having words." According to Lori, the defendant "was telling [Gilbreth] to get the heck out of the house." Lori was wearing her nightgown and went to change into clothes. She said that before the disturbance the defendant had been at his parents' home helping his father. She further said that the defendant did not leave their home after Gilbreth left, and the police arrived shortly after. Lori stated that she did not see the defendant with any items that did not belong to them nor did she see him with a black bag.

Lori spoke with a couple of the police officers who arrived at the scene and allowed them to search her home. She said that the officers were looking for a ring and a watch so she showed them where she and the defendant kept their jewelry. She said that she was sitting on her front porch and an investigator asked her whether the hammer the officers had found looked familiar. She told the investigator that she did not recognize the stickers on the hammer's handle. Lori showed the investigators the drawer in which she and the defendant kept their hammer, but the hammer was not in the drawer. She said that the investigator told her that the defendant used the hammer to break into Gilbreth's home. She did not remember at the time of the defendant's arrest, but Lori later remembered that the defendant was building shelves in their computer room. Lori said that, to her knowledge, the officers did not retrieve any items from her and the defendant's home.

---

[1] Several witnesses have the last name Walton. We will refer to them by their first names to avoid confusion and do not intend any disrespect.

Lori did not know Bedwell and did not speak with Bedwell or Gilbreth during the incident. She also did not speak with the defendant much before the police arrested him. She recalled, though, that the defendant said that he "was being accused of breaking into this man's house," but she did not know anything about the incident. According to Lori, the defendant and Gilbreth had problems and did not get along.

On cross-examination, Lori said that she married the defendant on July 18, 2008. She said that she was crying while she spoke with the investigators because the police had arrested her husband. She denied she was crying because she thought he had broken into Gilbreth's home. She also denied that she told the officers that the hammer appeared to look like the defendant's hammer. She said that she did not want to see the defendant get in trouble for the burglary of Gilbreth's home because she loved him.

Nancy Walton, the defendant's mother, testified that she was at church the day that authorities arrested the defendant for burglarizing Gilbreth's home. The day after the defendant's arrest, she encountered Gilbreth while working in her front yard. She said that Gilbreth called her name, and when she looked to the side, she saw Gilbreth approaching her. She said that he came into her yard and asked if she was okay. She asked him why he was speaking to her. She said they then had the following exchange:

> [I] said, "Why do you care if I'm okay?" I said, "How do you think I feel? My son was just arrested." And he said, "Well, he robbed my house." I said, "How do you know he robbed [your] house? He was with his father." And he said, "Well, when we came home, my girlfriend and I went in the house [and] we noticed that . . . the house was messy, you know, like someone had been in there so we started looking around." He said then his girlfriend finally said, "Well, I'm gonna [sic] call the police anyway." He said he started down the hall and he noticed his back door was messed up. So he went toward the door and he said he heard a sound and when he opened it he saw my son climbing over that nine foot privacy fence.
> . . . .
> And I said, "You saw my 230 pound son climbing over that fence[?]" He said, "Well yeah, he had a little trouble at first but finally got over,["] and he said ["H]e put his arm like this, and when he did he put a big gash right here . . . in his arm." Well, I told him I knew where my son was and my son didn't do that. And I said, "You're never nice to my son anyway or anybody here." And he said, "Well, I don't speak to [the defendant]."
>
> . . . .

-11-

And I said, "Well, why?" And he said, "Because I don't like him."

At that point, Nancy decided to end the conversation. She said that "the first thing [she] was gonna [sic] do when [she] saw [the defendant] that Friday was to make him show [her] his arms because [she] knew if there was a mark on his arm [she] would never be back at that jail." She also said that she would not have testified for him if he had a mark on his arm. Nancy explained that she loved the defendant, but she also loved God. She said that she visited him in jail, and he showed her his arms, which did not have scratches on them. She told the defendant to have police officers check his body to verify that he did not have any scratches or marks on him.

On cross-examination, Nancy testified that she was not present when the defendant allegedly jumped over the fence and did not have independent knowledge of how he may have done so. She said that she loved the defendant and did not want to see anything happen to any of her children. She stated that she did not want the jury to find the defendant guilty because he was innocent. When asked whether she liked Gilbreth she answered, "Right now I'm scared to death of him. I'd never really disliked him but I'm scared of him. I have to sleep next door to him and he came at me with a gun and my window's right there. I don't trust him." Regarding Gilbreth pulling a gun on her and James, she said that she filed a police report in which she stated that she thought the gun was a stick and James noticed it was a gun. They pressed charges against Gilbreth for the gun incident, but the judge dismissed the case for lack of evidence.

The defendant, James Alton Walton, Jr., testified that he had previous convictions for fraud, forgery, and obtaining a controlled substance by fraud. He denied that he and Gilbreth were acquaintances and said that they "just [did] not get along." The defendant said that he had never gotten along with Gilbreth and that Gilbreth had altercations with his parents before the defendant moved into his home next door to Gilbreth.

He said that Gilbreth was cruel toward animals and that there were incidents between Gilbreth and his dog. He also said that he and Gilbreth had verbal disputes about their property, that Gilbreth called his landlord, and that he talked about him to their neighbors. He admitted that he had threatened to "beat [Gilbreth] up" several times.

The morning of June 29, 2008, the defendant was at his parents' home with his father and uncle. He said that he and his uncle decided to leave around 12:00 p.m. because his mother would be home shortly. The defendant walked his uncle outside, said goodbye, and walked to his home. The defendant had to walk past Gilbreth's home to get to his home. He said that as he was walking up his driveway toward the back of his home, Gilbreth was

running down his driveway calling the defendant's name and accusing the defendant of robbing his home. He told Gilbreth to get out of his yard or he "was gonna [sic] put him out of [his] yard." The defendant said that he walked to the back of his home. Lori was inside their home sleeping, and he wanted her present in case he and Gilbreth had an altercation. He said that when he walked through his back door, Gilbreth followed him inside "in a threatening manner." He said that he told Gilbreth to leave his home or he would shoot him. The defendant said that he did not have a gun, but he "was willing to say whatever it took to get Gilbreth to leave [his] home." He said that Gilbreth replied, "'What are you gonna [sic] do shoot me with my own gun? I know you've done [sic] robbed me four or five times.'" The defendant told Gilbreth that he had never robbed him. The defendant's wife came to the door and asked what was going on, and at the point, Gilbreth left.

The defendant testified that he did not know Bedwell personally but had seen her at Gilbreth's home a couple days before the incident. He said that he saw her on Gilbreth's porch the day of the incident. The defendant denied committing any offense on June 29 and said that he "just want[ed] Gilbreth to leave [his] family alone."

On cross-examination, the defendant testified that he told the police that he saw "'[s]ome tall skinny guy running'" because he had seen a man who fit that description near their homes. According to the defendant, his neighbors had seen someone in their yard before June 29. He stated that, before the day of the incident, he and his wife had also seen a man cutting through their yard and on the hill bank above their home. The defendant told the police officers that his neighbors had a photograph of the man "tampering around their house as well."

After hearing the evidence, the jury convicted the defendant of aggravated burglary, a Class C felony, and theft of property $500 or less, a Class A misdemeanor. On August 25, 2009, the trial court sentenced the defendant as a persistent offender to ten years for the aggravated burglary and eleven months and twenty-nine days for the theft of property $500 or less. The court ordered that the defendant serve the sentences in this case concurrent with each other but consecutive to his sentences he had been serving on probation in case numbers C05-125 and C05-219. The defendant timely appealed his convictions and sentences.

**Analysis**

*Sufficiency*

The defendant argues that the evidence was insufficient to support his convictions. Specifically, he argues that when viewing his convictions under the totality of the circumstances, "no objective trier of fact could have convicted him." He asserts that no objective trier of fact could have convicted him because (1) the timeline of events that the

state presented was impossible; (2) Gilbreth made false statements; (3) the police did not recover all of the allegedly stolen items; (4) Gilbreth and Bedwell gave conflicting testimony; and (5) the state did not use any scientific evidence to corroborate the victims' allegations.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

The jury convicted the defendant of aggravated burglary and theft of property less than $500. Tennessee Code Annotated defines aggravated burglary, in relevant part, as entering a habitation without the effective consent of the owner and with the intent to commit a felony, theft, or assault. Tenn. Code Ann. § 39-14-402(a)(1), -403(a). A habitation is defined as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" *Id*. § 39-14-401(1)(A). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. at § 39-14-103.

Viewed in the light most favorable to the state, the evidence showed that Gilbreth and Bedwell saw the defendant leaving Gilbreth's property with their laptops. When confronted by the victims, the defendant attempted to hide the property under a rug and later placed it in a black garbage bag. Gilbreth's back door was unhinged, and the lock to his bedroom door was broken. Gilbreth did not give the defendant permission to enter his home and take his laptop and cedar lock box. Likewise, Bedwell did not give the defendant permission to take her laptop. Gilbreth and Bedwell testified that their laptops cost $700 and $900, respectively. The defendant's arguments regarding the sufficiency of evidence essentially amount to an attack on the state witnesses' credibility. However, by convicting the defendant, the jury obviously rejected the testimony of the defense witnesses and accredited the testimony of the state's witnesses. We will not re-weigh or re-evaluate the evidence. *See Reid*, 91 S.W.3d at 277. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's convictions for aggravated burglary and theft of property $500 or less.

*Sentencing*

Next, the defendant contends that the trial court erred when it ordered him to serve his sentences consecutively to his probation violations in case numbers C05-125 and C05-126. He asserts that the trial court did not consider the seven factors listed in Tennessee Code Annotated section 40-35-115, and thus, we should reverse the trial court's imposition of consecutive sentencing. We disagree.

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). "This presumption is 'conditioned upon an affirmative showing in the record that the trial [judge] considered the sentencing principles and all relevant facts and circumstances.'" *State v. Pettus*, 986 S.W.2d 540, 543 (Tenn. 1999) (quoting *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997)). If the trial court fails to comply with the statutory directives, "there is no presumption of correctness and our review is *de novo*." *State v. Poole*, 945 S.W.2d 93, 96 (Tenn.1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review,

we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:

>(1) [t]he evidence, if any, received at the trial and the sentencing hearing;
>(2) [t]he presentence report;
>(3) [t]he principles of sentencing and arguments as to sentencing alternatives;
>(4) [t]he nature and characteristics of the criminal conduct involved;
>(5) [e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114;
>(6) [a]ny statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>(7) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000).

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria applies:

>(1) [t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>(2) [t]he defendant is an offender whose record of criminal activity is extensive;
>(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the

sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

When ordering that the defendant serve his sentences consecutively the trial judge advised the defendant, "because of these convictions, your probation in Case Nos. C05-125, C05-129, C05-219, . . . is revoked. Those sentences are reinstated, and you are sentenced to 10 years in the Tennessee Department of Correction in this particular case. The sentences will run consecutive." While the trial court did not go into great detail regarding the imposition of consecutive sentences, it is clear from the record that the court was sentencing the defendant for offenses committed while he was on probation. The record reflects that on July 12, 2005, the trial court sentenced the defendant to four years probation in case number C05-219 and one year in the county jail followed by three years of probation in case number C05-125. The defendant committed the underlying offenses on June 29, 2008. Because the trial court found at least one statutory criteria to support consecutive sentencing - it sentenced the defendant for an offense committed while on probation - the trial court's imposition of consecutive sentencing in the defendant's case was justified. *See* Tenn. Code Ann. § 40-35-115(b)(6). The defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE

-17-